IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

| | | |
|---|---|---|
| JOSEPH BAYNES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Act No. _____ |
| | ) | |
| NOEL BROWN, SHERIFF | ) | Complaint |
| BULLOCH  COUNTY, GEORGIA; | ) | Damages |
| SERGEANT TONIA SCROGGINS; | ) | Injunctive Relief |
| CORPORAL JOSEPH HALL; | ) | Jury Requested |
| CORPORAL CHRISTOPHER BRISTOR; | ) | |
| SERGEANT JAMES SINCLAIR; | ) | |
| SERGEANT STEVEN GWIN; | ) | |
| CORPORAL GARRETT EDWARDS; | ) | |
| CORPORAL JEREMY HALL; | ) | |
| CORPORAL JAMES KINKADE; | ) | |
| SERGEANT ELENA ROBERTS; | ) | |
| DEPUTY CHRISTIAN MCBRIDE; | ) | |
| CORPORAL GUSTAVO BROWN; | ) | |
| CORPORAL RAYMOND BRADDY; | ) | |
| SERGEANT CURMIT WILLIAMS; | ) | |
| CAPTAIN KENNETH THOMPSON; | ) | |
| CORPORAL KIMBERLY SUTTON; | ) | |
| CORPORAL BENJAMIN POWELL; | ) | |
| CORPORAL DOMINIQUE ALBRITTON, | ) | |
| in their individual and official capacities, | ) | |
| for actions taken under color of law, and | ) | |
| | ) | |
| BULLOCH COUNTY, a public entity | ) | |
| subject to  A PUBLIC | | |
| Defendants. | ) | |
| | ) | |
| All sued jointly and severally, and/or in | ) | |
| conspiracy with one another. | ) | |
| _____ | ) | |

**COMPLAINT**

## INTRODUCTION

1.      This action arises from Defendants' systematic violations of Plaintiff's constitutional and

statutory rights through four distinct categories of unlawful conduct: (1) the deliberate denial of

prescribed psychiatric medication for Plaintiff's mental disability despite notice at intake in June 2023; (2) the use of excessive force, including tackling, punching, and multiple taser deployments on June 6, July 23, and July 25, 2023; (3) prolonged punishment and retaliation through restraint chair confinement on seven occasions between June 4 and August 17, 2023, without physician authorization or appropriate medical supervision; and (4) violations of the Americans with Disabilities Act through denial of reasonable accommodations and punishment based on manifestations of Plaintiff's disability from early June 2023, until his release August 31, 2023.

2.      On the following seven occasions, Defendants tightly strapped Plaintiff in a restraint chair for the indicated periods:

(1) June 4, 2023: 2:00 AM until 8:00 AM (6 hours), during which Plaintiff was denied bathroom access despite repeated requests.

(2) June 6, 2023: 1:00 PM to 9:00 PM (8 hours), during which Plaintiff urinated on himself, followed by extended solitary confinement from June 6 through July 11, 2023, confined to a cell for 23 hours daily without operational communication systems, eliminating contact with others, medical staff, or the ability to make phone calls.

(3) July 12-13, 2023: 7:00 PM on July 12 until 10:30 AM on July 13 (over 15 hours). After Defendants withheld medication they knew Plaintiff had been prescribed, the deterioration of Plaintiff's mental condition caused him to start a fire. Defendants responded by placing him in restraints without initial medical evaluation, forcing Plaintiff to urinate and defecate on himself.

(4) July 22, 2023: 12:30 AM to 2:00 PM (over 13 hours). After losing consciousness and waking up in a pool of urine, medical staff and Defendants refused to provide clean clothing. In frustration over this cruel and unusual treatment, Plaintiff flooded his cell. Defendants then restrained him, during which time he was denied food and urinated and defecated on himself.

(5) July 23, 2023: 1:00 AM until 6:30 PM the next day (over 17 hours), after Plaintiff attempted to run out of the jail when his cell was opened for toilet paper delivery.

(6) August 16, 2023: 3:00 PM until 8:00 AM the next day (17 hours). After Plaintiff attempted to escape during extradition and was recaptured, he threatened a lawsuit.

Captain Thompson then ordered Plaintiff placed in the restraint chair, during which he urinated and defecated on himself. During the 17 hours, no nurse, let alone a doctor, checked on him, while Defendants continued to wantonly withhold prescribed medication needed to control his mental disability.

(7)  August 17, 2023: 8:00 AM on August 17 until the morning of August 18 (20 hours), during which time he urinated and defecated on himself. Defendants prevented Plaintiff from taking a shower until August 20, even though officers reported they could smell him through the door.

3.      On July 23, 2023, Captain Thompson ordered that Plaintiff be shackled at all times, even while in his cell.

4.      Although Defendants knew they had withheld medication that would impact Plaintiff's behavior, they denied him benefits allowed to others without disabilities, including access to the grievance process and appropriate medical care. Defendants punished Plaintiff based on manifestations of his disability, in violation of the ADA.

5.       This action alleges objectively unreasonable treatment and deliberate indifference to the serious medical and mental health needs of a pretrial detainee and retaliation for protected activity, brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's rights under the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 and 28 C.F.R. §35, et seq., the Rehabilitation Act ("RA"), 29 U.S.C. § 794, et seq.

6.      Plaintiff Joseph Baynes seeks monetary damages and declaratory relief against Defendants for their systematic use of excessive force, cruel and unusual punishment, and deliberate indifference to his medical and safety needs while he was detained at the Bulloch County Jail from June 4, 2023, through August 31, 2023.

**JURISDICTION AND VENUE**

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

8.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in Bulloch County, Georgia, which is within this judicial district.

9.    The Court has supplemental jurisdiction over state supplemental claims.

**PARTIES**

10.    Plaintiff Joseph Baynes is an individual who, at all times relevant herein, was a pretrial detainee at the Bulloch County Jail in Statesboro, Georgia.

11.    Defendant Bulloch County, Georgia is a public entity under the ADA and a political subdivision of the State of Georgia that funds and operates the Bulloch County Jail and employs the individual defendants named herein.

12.    The individual defendants are employees of the Bulloch County Sheriff's Department and are sued in their individual and official capacities, and at all times relevant herein, were acting under color of law.

13.    Sheriff Noel Brown of Bulloch County, Georgia, and Captain Kenneth Thompson are named as defendants in their individual and official capacities for actions taken under color of law, and for their actions as policymakers makers in jail operation.

14.    The following law enforcement officers are also named as defendants in their individual and official capacities for actions taken under color of law: Sergeant Tonia Scroggins, Corporal Joseph Hall, Corporal Christopher Bristor, Sergeant James Sinclair, Sergeant Steven Gwin, Corporal Garrett Edwards, Corporal Jeremy Hall, Corporal James Kinkade, Sergeant Elena Roberts, Deputy Christian McBride, Corporal Gustavo Brown, Corporal Raymond Braddy, Sergeant Curmit Williams, Corporal Kimberly Sutton, Corporal Benjamin Powell, and Corporal Dominique Albritton.

15.     The acts and omissions of the Defendants as set forth herein, were at all material times pursuant to the actual customs, policies, practices and procedures of Defendant Bulloch County and approved and/or tolerated by individual and/or policymakers Sheriff Brown and/or Captain Thomspon.

16.     At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of Georgia.

17.     This complaint may be pled in the alternative pursuant to Federal Rule of Civil Procedure 8(d).

**FACTUAL ALLEGATIONS**

**Background**

18.     Plaintiff was arrested by Bulloch County officers and brought to the Bulloch County Jail after an incident in which Plaintiff took a golf cart from Georgia Southern University and was driving it.

19.     During his arrest, Plaintiff was beaten, tased, punched, and kicked by officers, resulting in two black eyes visible in his booking photo.

20.     At all times relevant to this action, Plaintiff was a pretrial detainee who had not been convicted of any crime and was presumed innocent under the law.

21.     Plaintiff suffers from PTSD and requires medication for his mental health condition.

22.     At intake Plaintiff informed staff of at the jail of the fact that he had been prescribed medication for a serious mental condition that caused anxiety and depression.

23.      Throughout his detention Plaintiff repeatedly requested medication.

24.     Despite multiple signed releases of information, jail officials failed to obtain Plaintiff's medical records from Minnesota or provide him with necessary and prescribed psychiatric medication.

25.    Despite behavior obviously indicative of a person with a mental disability, unless controlled by medication, foreseeably Plaintiff repeatedly engaged in activity driven by the uncontrolled anxiety and depression, which was then compounded by the cruel and unusual treatment of Plaintiff by Defendants, which was not objectively reasonable under the circumstances.

**Chronology of Constitutional Violations**

**First Restraint Chair Incident - June 4, 2023**

26.    At approximately 2:00 AM, Corporals Hall and Bristor attempted to remove one of Plaintiff's rings, and when Plaintiff explained that particular ring could not be removed, the officers said they would cut it off.

27.    Plaintiff pulled his hand back and said he would not let them cut it.

28.    Cpl. Bristor and Hall grabbed Plaintiff, and Sgt. Scroggins pulled up the restraint chair, and they pushed and slammed me into the chair.

29.    They applied pressure points and strapped the restraints on too tight, and a nurse came to check the restraints and told Cpl. Hall to loosen them, because they were too tight.

30.    Cpl. Hall loosened it and then they wheeled Plaintiff to the old visitation room securing the chair to one of the stools with a set of leg irons.

31.    Defendants Sergeant Scroggins, Corporals Hall and Bristor pushed and slammed Plaintiff into the restraint chair, applying painful pressure points and securing restraints so tightly that a nurse ordered them loosened.

32.    Known Defendant individuals of Scroggins, Hall, and Bristor, who put Plaintiff in the restraint chair; unknown individual officers; including the Sheriff, individually or jointly with others, wantonly left Plaintiff strapped in the restraint chair in the old visitation room from

approximately 2:00 AM until 8:00 AM (6 hours), during which Plaintiff was denied bathroom access despite repeated requests.

33.     Defendants are uniquely in the position to know who had authority to prevent their agents from putting Plaintiff in the restraint chair, and who had authority to prevent its punishing use and to let him out before causing needless pain and suffering.

34.     Being strapped in a restraint chair, even for a short period, can be a deeply distressing and potentially traumatic experience for a detainee, adversely impacting their emotional well-being in several significant ways, which happened to Plaintiff each time or as a result thereof, especially with the prolonged periods during which he was in the restraint chair.

35.     Plaintiff has pre-existing PTSD from trauma during childhood, and as a result of being put in the restraint chair numerous times suffered psychological trauma and distress, because being immobilized is frightening, degrading, and triggers emotions like fear, anxiety, and a sense of helplessness, severe enough to reawaken past traumas, like in Plaintiff's case.

36.     Plaintiff suffered humiliation and dehumanization, and feelings of intense embarrassment and shame, including from being in the visitation room where no one was around for ongoing observation, and he feared further beating and mistreatment.

37.     Plaintiff suffered loss of control and powerlessness, by complete restriction of movement and inability to act induced feelings of profound powerlessness and loss of control over one's own body functions and an inability to defend oneself.

38.     Plaintiff was subjected to extremely, and increasingly prolonged periods of being in the restraint chair, and without his medication he had little control over the his own behavior and yet knew that the prolonged periods of restraint, without medical intervention and which caused loss of bodily control, was perceived as unjust or excessive restraint and generated intense feelings of

anger, resentment, and frustration towards the staff and the system itself, making him feel like he was being punished for their mental illness or behavior cased by the mental illness, rather than receiving appropriate care.

39.    The very act of restraint increased his agitation and resistance, which went unmollified because Defendants refused to provide medication, they had a duty to provide.

40.    The use of restraint severely damaged Plaintiff's ability to trust staff, hindering future therapeutic relationships and potentially leading to reluctance to seek help in the future.

41.    The experience of the challenged restraints left a lasting impact, leading to ongoing fear and anxiety leaving him with nightmares and intrusive memories.

42.    Defendants' misuse of the restraint chair as punishment, instead of as a last resort in emergency situations to prevent harm, for a short period begetting medical intervention, amplified the negative psychological consequences.

43.    Additionally, each time involved severe and prolonged physical pain, with includes lingering back pain.

44.    Plaintiff yelled many times that he  I had to use the bathroom when he  I would see someone at the tower window.

45.    Around 8 AM the nurse came with a Corporal and they took plaintiff  me out of the chair and brought him back to booking, and then he was put in general population, B-Block.

**Second Restraint Chair Incident and First Taser Deployment - June 6, 2023**

46.    Corporal Edwards confronted Plaintiff about allegedly hitting the plexiglass in his cell, and despite Plaintiff's explanation that he had not; and Plaintiff posed no threat to anyone, Edwards ordered a lockdown and summoned additional officers.

47.    Defendants Edwards, Gwin, and Sinclair slammed Plaintiff to the ground, picked him up, and slammed him down again on his face, threatening to make his life "very hard."

48.     After moving Plaintiff to cell G-110, Defendants Gwin, Sinclair, and Edwards deployed a taser with darts with two cycles, tackled him, punched him, and applied painful pressure points., leaving Plaintiff permanently scared.

49.     Plaintiff was then forced into the restraint chair using pressure points, pushing, and slamming, with restraints tightened to the point of cutting off circulation.

50.     Despite a nurse's order to loosen the restraints, Corporal Edwards refused to comply initially, leaving Plaintiff unable to feel his hands.

51.     Plaintiff was denied bathroom access and was forced to urinate on himself. He remained in the restraint chair from approximately 1:00 PM to 9:00 PM (8 hours).

52.     Extended Solitary Confinement - June 6 through July 11, 2023

53.     Following this incident, Plaintiff was placed in administrative segregation in L-Block and later G-Hall, where he was confined to his cell for 23 hours per day.

54.     The cells lacked operational communication systems, preventing Plaintiff from contacting medical staff or making necessary phone calls.

55.     Plaintiff was only allowed out every other day for approximately 40 minutes to shower and use phones, and was denied cleaning supplies and adequate toilet paper.

56.     Officers repeatedly denied Plaintiff's requests for grievance forms and threatened retaliation if he filed complaints, which occurred throughout plaintiff's incarceration at the jail operated by the defendants., who had withheld his medication, which caused the pager which resulted in their retaliation and punishment including to prevent him from having access to grievance forms.

**Medical Emergency and Continued Abuse - June 20-21, 2023**

57.     On June 20, 2023, Plaintiff was taken to the hospital after becoming unresponsive.

9

58.    Upon regaining consciousness at the hospital, Corporal Brown pinned him down and called for backup, after which Plaintiff was returned to jail and placed in cell G-112 without proper medical evaluation.

**Third Restraint Chair Incident - July 12-13, 2023**

59.    Deteriorating mentally without medication and desperate due to his conditions, Plaintiff started a fire in his cell.

60.    Defendants Edwards, Sinclair, and Roberts pulled him from the cell, threatening his life and using profanity while cuffing him.

61.    After a cursory 3-minute medical check, Plaintiff was placed in cell G-003, described as dungeon-like with no bunk, no water, rusted door, and peeling paint.

62.    Sgt Gwin called Captain Thompson ordered Plaintiff to be placed in the restraint chair on suicide watch. Defendants Edwards and McBride forced him into the chair using pressure points, hitting, and slamming.

63.    No nurse initially checked the restraints, and Plaintiff was left secured from approximately 7:00 PM on July 12 until 10:30 AM on July 13 (over 15 hours).

64.    Plaintiff was again denied bathroom access and was forced to urinate and defecate on himself.

**Fourth Restraint Chair Incident - July 22, 2023**

65.    After losing consciousness and waking up in a pool of urine, Plaintiff reported the incident to medical staff who ignored it and refused to provide clean clothing.

66.    When Plaintiff flooded his cell in frustration, road deputies with tasers and a dog were brought in to restrain him.

67.    Plaintiff was placed in the restraint chair from approximately 12:30 AM to 2:00 PM (over 13 hours), during which he again defecated on himself and was denied food.

68.     Fifth Restraint Chair Incident and Second Taser Deployment - July 23, 2023

69.     In a desperate attempt to escape his conditions, Plaintiff rushed past Deputy Kinkade when his cell was opened for toilet paper delivery.

70.     After being cornered in the booking area, officers tackled Plaintiff and deployed a taser into his arm and hand, leaving permanent scars from prolonged electrical contact.

71.     Defendants Sutton, Kinkade, and Roberts placed Plaintiff in the restraint chair from approximately 1:00 AM until 6:30 PM the next day (over 17 hours).

72.     Captain Thompson ordered that Plaintiff remain shackled with leg irons at all times, even in his cell, and was denied shower privileges.

73.     Third Taser Deployment - July 25, 2023

74.     When Defendants Edwards and Brown came to escort Plaintiff to court, he refused to go and sat naked in the back of his cell in leg irons.

75.     Despite Plaintiff's non-threatening position, Defendants Edwards and Braddy deployed tasers on his naked body, striking him in the abdomen.

76.     A nurse witnessed this incident and reportedly scolded Edwards for the inappropriate taser use.

77.     At court, Plaintiff was denied private consultation with his attorney, and Sergeant Gwin threatened him with worse treatment if he didn't accept the first plea deal offered.

**Sixth Restraint Chair Incident - August 16, 2023**

78.     During the extradition process to Minnesota, Plaintiff voiced complaints about his treatment to Captain Thompson, Sergeant Gwin, and Corporal Edwards.

79.     At East Georgia Regional Medical Center, medical staff forcibly sedated Plaintiff with Haldol against his will after he refused an unknown medication.

80.    Plaintiff was then returned to jail and placed in the restraint chair by Captain Thompson and Sergeant Gwin, who threatened him about filing lawsuits.

81.    Plaintiff remained in the chair from approximately 3:00 PM until 8:00 AM the next day (17 hours), during which he urinated and defecated on himself with no nurse checking his restraints.

**Seventh Restraint Chair Incident - August 17, 2023**

82.    After being released from the chair at 8:00 AM, Plaintiff was denied breakfast and shower despite not eating since noon the previous day and being soiled from bodily waste.

83.    When Plaintiff covered his observation window in protest, Defendants Gwin, Edwards, Albritton, and Powell entered his cell and violently forced him back into the restraint chair.

84.    Captain Thompson and Sergeant Gwin again threatened Plaintiff, saying he would "never get out" and they wouldn't feed him unless he complied.

85.    Plaintiff remained in the chair until the next morning (approximately 20 hours), again urinating and defecating on himself.

86.    Officers stated they could "smell him" through the door and only allowed him to shower on August 20, 2023.

## COUNT I: UNREASONABLE FORCE AND CONDITIONS OF CONFINEMENT IN VIOLATION OF THE FOURTEENTH AMENDMENT

87.    Plaintiff incorporates by reference all preceding paragraphs.

88.    As a pretrial detainee, Plaintiff had a right under the Fourteenth Amendment Due Process Clause to be free from punishment and to be subjected only to those conditions and restrictions that are reasonably related to legitimate governmental objectives.

89.     The treatment of pretrial detainees is governed by the objective reasonableness standard under the Fourteenth Amendment, which protects detainees from conditions, restrictions, and actions that amount to punishment.

90.     The individual defendants subjected Plaintiff to objectively unreasonable force and conditions, including:

91.     Repeated slamming and throwing Plaintiff to the ground when lesser force would have sufficed

92.     Multiple taser deployments, including on a naked, non-threatening detainee in a non-emergency situation

93.     Punching, kicking, and applying painful pressure points without justification

94.     Forcing Plaintiff into restraint chairs through violence when de-escalation techniques were available

95.     Using restraint chairs as punishment rather than for legitimate safety or security purposes

96.     Restraining Plaintiff for excessive periods (up to 20 hours) without reasonable justification

97.     Denying basic human needs including bathroom access, food, and hygiene

98.     Maintaining Plaintiff in punitive solitary confinement without due process

99.     These actions were not reasonably related to any legitimate institutional interests such as institutional security, safety, or the prevention of escape.

100.    The conditions imposed on Plaintiff amounted to punishment before trial, in violation of his presumption of innocence and due process rights.

101.    Alternatively, if the Court finds that the deliberate indifference standard applies to any aspect of Plaintiff's treatment, Defendants acted with deliberate indifference to Plaintiff's constitutional rights and safety.

**COUNT II: CONDITIONS OF CONFINEMENT AMOUNTING TO PUNISHMENT IN VIOLATION OF THE FOURTEENTH AMENDMENT**

102.    Plaintiff incorporates by reference all preceding paragraphs.

103.    As a pretrial detainee, Plaintiff could not be subjected to punishment prior to conviction.

104.    Defendants imposed conditions of confinement that were not reasonably related to legitimate governmental objectives, including:

105.    Extended placement in restraint chairs far exceeding any reasonable safety justification

106.    Denial of basic sanitation and hygiene needs

107.    Prolonged solitary confinement in substandard conditions

108.    Use of leg irons continuously, including while confined to his cell

109.    Denial of adequate recreation, phone access, and communication with the outside world

110.    Housing in dungeon-like conditions with no running water, rusted fixtures, and pest infestation

111.    These conditions served no legitimate institutional purpose and were imposed as punishment in retaliation for Plaintiff's complaints and legal threats.

112.    The conditions were objectively unreasonable and violated contemporary standards of decency.

113.    Alternatively, if the Court applies the deliberate indifference standard to any conditions of confinement, Defendants acted with deliberate indifference to the substantial risk of serious harm to Plaintiff's physical and mental health.

**COUNT III: DELIBERATE INDIFFERENCE TO MEDICAL NEEDS IN VIOLATION OF THE FOURTEENTH AMENDMENT**

114.    Plaintiff incorporates by reference all preceding paragraphs.

115.    As a pretrial detainee, Plaintiff had a right under the Fourteenth Amendment to adequate medical care.

116.    Under the objective reasonableness standard applicable to pretrial detainees, Defendants' medical care decisions were objectively unreasonable in light of known circumstances, including:

117.    Failing to obtain Plaintiff's medical records despite multiple signed releases and knowledge of his PTSD

118.    Refusing to provide necessary psychiatric medication despite clear evidence of mental health deterioration

119.    Ignoring reports of seizures and loss of consciousness without proper medical evaluation

120.    Providing only cursory medical attention after significant incidents involving force

121.    Allowing Plaintiff's mental health to deteriorate to the point of desperate acts without intervention

122.    Forcibly administering unknown medications without proper medical justification or consent

123.    Defendants knew or should have known that their failure to provide adequate medical care posed a substantial risk of serious harm to Plaintiff's physical and mental health.

124.    The medical treatment provided was objectively unreasonable and fell below contemporary standards of medical care for detained individuals.

125.     Alternatively, if the Court applies the deliberate indifference standard, Defendants were deliberately indifferent to Plaintiff's serious medical needs and disregarded an objectively intolerable risk of harm.

## COUNT IV: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT ("ADA") AND REHABILITATION ACT ("RA")

126.     126. Plaintiff incorporates by reference all preceding paragraphs.

127.     127. Title II of the ADA prohibits discrimination on the basis of disability by public entities, which the Act broadly defines as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B). Similarly, §504 of the Rehabilitation Act of 1973 proscribes discrimination by "any program or activity," 29 U.S.C. § 794(a), defined as "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b). Defendant Bulloch County is a covered entity for purposes of enforcement of the ADA, 42 U.S.C. §12181(7)(F), and the Rehabilitation Act, 29 U.S.C. § 794, pursuant to the regulations promulgated under each of these laws. Further, on information and belief, Defendant Bulloch County receives federal assistance and funds. Defendant Bulloch County is also within the mandate of the RA that no person with a disability may be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity." 29 U.S.C. § 794. Defendant Bulloch County is vicariously liable for the conduct of its employees and agents under the ADA and RA.

128.     128. The Bulloch County Sheriff's Office is a local agency of Defendant Bulloch County whose services, programs, and/or activities are covered under and governed by the ADA and RA, and regulations promulgated under each of these laws.

129.    129. Congress enacted the ADA upon a finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

130.    130. Title II of the ADA provides: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

131.    131. Discrimination under the ADA and RA includes not only, e.g., a denial of benefits and services or discrimination, but also a failure to provide a reasonable accommodation (also known as reasonable modification) for an individual's disability. The implementing regulations to § 12132 explain that discrimination on the basis of a disability includes instances when a person with a disability is "denied the benefits of, the services, programs, or activities of a public entity" "because [the facility's] facilities are inaccessible to or unusable by individuals with disabilities." 28 C.F.R. § 35.152(b)(1).

132.    132. Defendant Bulloch County is further mandated under the ADA not to utilize standards or criteria or methods of administration that have the effect of discriminating on the basis of disability. 42 U.S.C. § 12182(b)(1)(D)(i). Discrimination also includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities." 42 U.S.C. § 12182(b)(2)(A)(ii).

133.    133. For purposes of the ADA and RA, a government is vicariously liable for the knowledge and acts of each of its employees and agents.

134.    134. At all material times, as a person with Post-Traumatic Stress Disorder (PTSD) and other mental health conditions requiring psychiatric medication – recognized mental impairments under 28 C.F.R. § 35.108(b)(2) – Plaintiff JOSEPH BAYNES was a "qualified individual" with medical impairments that limited and/or substantially limited his ability to care for himself and control his mental, medical, or physical health condition as defined under the ADA, 42 U.S.C. § 12131(2), and under Section 504 of the RA, 29 U.S.C. § 794, 28 C.F.R. 42.450(k). Through its employees and agents, Defendant Bulloch County had knowledge of Plaintiff's disability, which was disclosed at intake when Plaintiff informed jail staff that he had been prescribed medication for his serious mental condition that caused anxiety and depression.

135.    135. Based on the information known by Defendant Bulloch County about Plaintiff's PTSD and mental health conditions, it was obvious that Plaintiff needed reasonable accommodations to avoid subjecting him to serious risk of harm from his mental health disability. As Plaintiff was a "qualified [disabled] individual," Defendant Bulloch County was required to make reasonable accommodations for Plaintiff's disability and provide access to medical and other appropriate services while he was in custody. Plaintiff's status as a qualified disabled person also required Defendant Bulloch County not to engage in discrimination based on disparate treatment of, or disparate impact on, disabled persons like Plaintiff. And, Plaintiff's status as a qualified disabled person also required Defendant Bulloch County not to exclude him from participation in, or deny him the benefits of, the County's and its jail's services, programs, or activities, including medical treatment.

136.    136. Defendant Bulloch County violated Plaintiff's rights under the ADA and Rehabilitation Act in three ways: (1) by fully excluding Plaintiff from participation in the County's services, programs, or activities for jail inmates with mental health disabilities; and/or

(2) by otherwise discriminating against Plaintiff with regard to the County's services, programs, or activities for jail inmates with mental health disabilities; and/or (3) by denying Plaintiff -- as a jail inmate deprived of the ability to secure his own medical care and treatment -- reasonable modifications or accommodations for his mental health disabilities, including PTSD and related conditions requiring psychiatric medication.

137.     137. Defendant Bulloch County completely denied Plaintiff any benefits, medical, or other services, or accommodations for his disability, thereby placing him at a more acute risk of harm than non-disabled inmates. Despite multiple signed releases of information and repeated requests for necessary psychiatric medication, jail officials failed to obtain Plaintiff's medical records from Minnesota or provide him with prescribed psychiatric medication. By and through its systematic delay or denial of medical services for pretrial detainees disabled by mental health conditions, Defendant Bulloch County demonstrated such wanton disregard for such disabled inmates' care that the outright denial of medical care can be found to be based on their disabled status.

138.     138. Defendant Bulloch County also discriminated against Plaintiff by failing to place him in a setting, and/or failing to provide appropriate services, to reasonably address his disability and disability-related medical needs. Defendant Bulloch County thereby subjected Plaintiff to both disparate treatment and disparate impact based on his disability class as a person with PTSD and mental health conditions requiring medication. Defendant Bulloch County's failure to reasonably address Plaintiff's disability and disability-related medical needs caused him to suffer greater injury and indignity in his incarceration in the County Jail than other non-disabled inmates and pretrial detainees.

139.    139. Furthermore, Defendants punished Plaintiff based on manifestations of his disability. Without his prescribed medication, Plaintiff's mental health deteriorated, leading to behaviors directly related to his untreated PTSD and mental health conditions. These manifestations of his disability – including the fire-setting incident, cell flooding, and attempts to escape his conditions – were foreseeable consequences of Defendants' failure to provide necessary psychiatric medication. Rather than providing appropriate accommodations, Defendants subjected Plaintiff to increasingly severe punishment through prolonged restraint chair confinement, excessive force, and solitary confinement, effectively punishing him for the manifestations of his disability.

140.    140. Obvious accommodations for Plaintiff's disability would have included, among others: obtaining Plaintiff's medical records and providing prescribed psychiatric medication; providing appropriate mental health care and monitoring; avoiding the use of prolonged restraint chair confinement as punishment for disability-related behaviors; providing access to mental health professionals; ensuring appropriate medical evaluation after incidents involving force; and modifying disciplinary procedures to account for disability-related behaviors rather than imposing punitive measures that exacerbated Plaintiff's condition.

141.    141. Defendants, through their employees and agents, acted as described in this Complaint despite knowing, at all relevant times, that Plaintiff was a qualified individual under the ADA and RA with a disability that required reasonable accommodations to prevent serious harm and deterioration of his mental health condition.

142.    142. Thus, due to Defendant Bulloch County's failure to reasonably address and accommodate Plaintiff's disability, and Defendant Bulloch County's conduct and decisions that had a disparate impact on him and other similarly disabled individuals, causing Plaintiff to suffer

greater injury and indignity than other non-disabled inmates, Defendant Bulloch County

effectively treated non-disabled inmates more favorably than individuals like Plaintiff with

mental health disabilities.

143.    143. Defendants also denied Plaintiff equal access to jail services, programs, and

activities. Plaintiff was denied access to the grievance process, with officers repeatedly refusing

to provide grievance forms and threatening retaliation if he filed complaints. This denial of

access to institutional procedures available to other inmates constituted discrimination based on

his disability status.

144.    144. As a result of the acts and omissions of Defendant Bulloch County complained of

herein, Plaintiff suffered prolonged mental anguish, physical pain, psychological trauma, and

ongoing effects from the denial of necessary medical care and reasonable accommodations for

his disability. Plaintiffs have suffered, and will continue to suffer damages and injuries as alleged

above. Plaintiff sustained serious permanent injuries and is entitled to damages, penalties, costs,

and attorney's fees under 42 U.S.C. § 12205, 28 C.F.R. §35, et seq., and 29 U.S.C. § 794, et seq.


**COUNT V: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS BY OUTRAGEOUS CONDUCT UNDER GEORGIA LAW**

145.    145. Plaintiff incorporates by reference all preceding paragraphs.

146.    146. Under Georgia law, a claim for intentional infliction of emotional distress requires

proof that: (1) the defendant either intended to inflict emotional distress or recklessly disregarded

the probability that such distress would result from his conduct; (2) the defendant's conduct was

so extreme and outrageous as to exceed all possible bounds of decency and is regarded as

atrocious and utterly intolerable in a civilized community; (3) there is a causal connection

between the defendant's conduct and the plaintiff's emotional distress; and (4) the emotional distress suffered is severe.

147.    147. Defendants' conduct toward Plaintiff was extreme and outrageous, exceeding all possible bounds of decency and constituting behavior that is atrocious and utterly intolerable in a civilized community, including but not limited to:

148.    148. **Prolonged and Repeated Torture Through Restraint Chair Abuse**: Defendants subjected Plaintiff to restraint chair confinement on seven separate occasions for periods ranging from 6 to 20 hours, using the restraint chair as punishment rather than for legitimate safety purposes. During these extended periods, Plaintiff was denied basic human dignity, forced to urinate and defecate on himself, denied food and water, and left in his own waste for hours while officers reportedly stated they could "smell him through the door."

149.    149. **Deliberate Psychological Torture**: Knowing that Plaintiff suffered from PTSD and had pre-existing trauma from childhood, Defendants intentionally created conditions designed to maximize psychological suffering. The restraint chair confinement was specifically calculated to trigger Plaintiff's PTSD, cause feelings of helplessness, and reawaken past traumas. Defendants were aware that immobilization would be particularly traumatic for someone with Plaintiff's mental health history.

150.    150. **Sadistic Denial of Medical Care**: Despite knowing that Plaintiff required psychiatric medication for his mental health condition, Defendants deliberately withheld this medication and then punished him for the predictable behavioral consequences of his untreated mental illness. This created a cruel cycle where Defendants caused Plaintiff's mental deterioration through medical neglect, then used that deterioration as justification for increasingly severe punishment.

151.      151. **Systematic Degradation and Humiliation**: Defendants engaged in conduct specifically designed to degrade and humiliate Plaintiff, including: forcing him to remain in his own waste for extended periods; denying shower privileges while acknowledging the smell; threatening to "make his life very hard"; and using profanity and death threats during restraint procedures. Officers told Plaintiff he would "never get out" and threatened not to feed him unless he complied with their demands.

152.      152. **Excessive and Gratuitous Use of Force**: Defendants repeatedly used excessive force against Plaintiff when he posed no threat, including: deploying tasers on his naked body while he sat non-threateningly in his cell; tackling and punching him during routine interactions; and slamming him to the ground repeatedly. The force was applied not for legitimate security purposes but to inflict pain and suffering.

153.      153. **Retaliation and Intimidation**: When Plaintiff attempted to file grievances or threatened legal action, Defendants retaliated with increased abuse, including extended restraint chair confinement and threats about filing lawsuits. Captain Thompson specifically threatened Plaintiff about pursuing legal remedies, demonstrating that the abuse was intended to silence complaints about unconstitutional treatment.

154.      154. **Sensory Deprivation and Isolation**: Defendants placed Plaintiff in prolonged solitary confinement for over a month, confining him to cells without operational communication systems, denying him access to telephones, and limiting human contact to brief interactions every other day. This isolation was designed to break down Plaintiff's psychological resistance and cause mental anguish.

155.      155. **Deliberate Infliction of Physical Suffering**: Beyond the psychological torture, Defendants intentionally caused severe physical suffering through: restraints applied so tightly

they cut off circulation; prolonged positioning that caused lasting back pain; denial of bathroom access for hours while secured in restraints; and withholding food and water during extended restraint periods.

156.    156. Defendants acted with the specific intent to cause severe emotional distress to Plaintiff, or alternatively, acted with reckless disregard for the probability that severe emotional distress would result from their conduct. The pattern, duration, and escalating nature of the abuse demonstrates that Defendants were not merely indifferent to Plaintiff's suffering, but actively sought to maximize it.

157.    157. Defendants knew that Plaintiff suffered from PTSD and mental health conditions that made him particularly vulnerable to psychological trauma. Despite this knowledge, Defendants deliberately employed tactics specifically calculated to exploit these vulnerabilities and cause maximum psychological harm.

158.    158. The conduct described herein was not isolated incidents but part of a sustained campaign of psychological and physical torture spanning nearly three months, from June 4, 2023, through August 31, 2023. The systematic nature of the abuse, its escalation over time, and the deliberate targeting of Plaintiff's known psychological vulnerabilities demonstrate intent to cause severe emotional distress.

159.    159. There is a direct causal connection between Defendants' extreme and outrageous conduct and Plaintiff's severe emotional distress. The abuse directly caused and continues to cause Plaintiff's psychological trauma, as evidenced by his ongoing symptoms and the lasting impact of the treatment he received.

160.    160. As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered and continues to suffer severe emotional distress, including but not limited to:

161.    161. **Severe Psychological Trauma**: Plaintiff has experienced intense psychological trauma from the repeated restraint chair confinement, which triggered his pre-existing PTSD and created new traumatic memories. The experience of being immobilized, degraded, and left in his own waste has caused lasting psychological damage.

162.    162. **Retraumatization and Exacerbation of PTSD**: The torture inflicted by Defendants has reawakened and severely exacerbated Plaintiff's pre-existing PTSD, causing flashbacks, nightmares, and intrusive memories that continue to torment him.

163.    163. **Ongoing Fear and Anxiety**: Plaintiff suffers from severe anxiety and fear stemming from his treatment, including fear of confinement, fear of authority figures, and generalized anxiety about his safety and well-being.

164.    164. **Loss of Trust and Relationship Difficulties**: The severe abuse has destroyed Plaintiff's ability to trust others, particularly those in positions of authority, and has hindered his ability to form therapeutic relationships or seek help in the future.

165.    165. **Feelings of Powerlessness and Helplessness**: The systematic degradation and torture have left Plaintiff with profound feelings of powerlessness, helplessness, and loss of control over his own body and circumstances.

166.    166. **Humiliation and Shame**: Plaintiff continues to suffer from intense feelings of humiliation and shame resulting from being forced to soil himself, being left in his own waste, and being treated in a manner that stripped him of all human dignity.

167.    167. **Physical Manifestations of Emotional Distress**: The severe emotional distress has manifested in physical symptoms, including ongoing pain from the restraint chair confinement, sleep disturbances, and other somatic symptoms related to the psychological trauma.

168.    168. The emotional distress suffered by Plaintiff is severe and goes far beyond ordinary annoyance, inconvenience, or normal grief. The sustained nature of the abuse, its calculated cruelty, and its exploitation of Plaintiff's known vulnerabilities have caused psychological damage that meets the standard for severe emotional distress under Georgia law.

169.    169. Defendants' conduct was so extreme and outrageous that it shocks the conscience and exceeds all bounds of decency tolerated in a civilized society. No reasonable person could view the systematic torture, degradation, and psychological abuse inflicted upon Plaintiff as anything other than atrocious and utterly intolerable.

170.    170. As a direct and proximate result of Defendants' intentional infliction of emotional distress through extreme and outrageous conduct, Plaintiff has suffered and continues to suffer severe damages, including ongoing psychological trauma, mental anguish, and the need for extensive psychological treatment and therapy.

171.    171. Plaintiff is entitled to compensatory damages for his severe emotional distress, punitive damages to punish Defendants for their extreme and outrageous conduct and to deter similar conduct in the future, and such other relief as this Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff and against all Defendants;

B. Award compensatory damages in an amount to be determined at trial;

C. Award punitive damages against the individual defendants;

D. Award attorney's fees and costs pursuant to 42 U.S.C. § 1988;

E. Grant such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ John P. Batson
John P. Batson
Georgia Bar No. 042150
1104 Milledge Road
Augusta, GA 30904
706-737-4040
jpbatson@aol.com
Attorney for Plaintiff